17247, 17248.  MEREDITH *v.* FAY & EGAN COMPANY; and

*vice versa.*

STEPHENS, J.  1. Where a written contract for the sale of particularly described machinery, generally referred to in the contract as a "planer and matcher" and a "trimmer," expressly provides that in case of rejection of the property the purchaser will deliver it to the seller f. o. b. Cincinnati, and that this contract "is not modified or added to by any agreement not expressly stated herein, and that a retention of the property forwarded, after thirty days from its arrival at destination, shall constitute a trial and acceptance, [and?] be a conclusive admission of the truth of all representations made by or for the consignor [seller], and a fulfillment of all its contracts of warranty expressed or implied," the purchaser, who has retained the property for more than thirty days after its arrival at destination, although in the meantime he may have given to the seller notice of certain alleged defects in the property and of his dissatisfaction with the property by reason of such defects, has, by the terms of the contract, accepted the property and waived any right to call upon the seller for damages for a breach of any of the warranties, express or implied.  *Fay & Egan Co.* v. *Dudley,* 129 *Ga.* 314 (58 S. E. 826).

2. The terms of the contract govern the rights of the parties, and any efforts made by the seller to remedy the alleged defects pointed out by the purchaser will not amount to a waiver by the seller of his rights under the contract to hold the purchaser to an acceptance of the property sold, upon failure to return it within the thirty days stipulated in the contract.  The failure of the purchaser to so return the property will amount to a waiver of any right to call upon the seller for damages for breach of warranty.

3. Where the defects in the machine are patent and are easily discoverable when using the machine, the purchaser can not defend against a suit on the contract by the seller on the ground that the seller's express or implied representations as to the character of the machine constituted a fraud.  ·

4. Where the delivery of the property sold was made by the seller beyond the time contracted for, an acceptance of the property by the purchaser, without protest upon the ground of delay, and the execution by the purchaser of the purchase-money notes, upon delivery of the property, and a payment by the purchaser of one of the purchase-money notes after delivery of the property, amount to a waiver by the purchaser of any right to damages against the seller for delay in delivery.  *Moore*

Sales, 35 Cyc. p. 74, n. 67; p. 185, n. 67; p. 432, n. 38; p. 574, n. 83.

v. *Smith Machine Co.*, 4 *Ga. App.* 151, 153 (60 S. E. 1035); *Lingo* v. *Phœnix Hermetic Co.*, 31 *Ga. App.* 547 (4, *b*) (121 S. E. 253).

5. In a suit by the seller against the purchaser to recover for the unpaid purchase-money of the machinery delivered under the contract, applying the above rulings to the undisputed evidence, the court did not err in directing a verdict for the plaintiff.

*Judgment affirmed on the main bill of exceptions; cross-bill dismissed. Jenkins, P. J., and Bell, J., concur.*

DECIDED FEBRUARY 28, 1927.

Complaint; from Fulton superior court—Judge Bell.　January 26, 1926.

STATEMENT OF FACTS BY STEPHENS, J.

J. A. Fay and Egan Company sued Meredith upon his notes given for the purchase of machinery under a contract containing provisions set out in the foregoing decision. The defendant pleaded fraud and breach of warranty, and alleged that the plaintiff's conduct in undertaking to repair defects in the machinery amounted to a waiver of its rights under the contract. He prayed for damages for an alleged delay in delivery of the machinery after the date for delivery specified in the contract. The court directed a verdict for the plaintiff.

It appears from uncontradicted evidence that on delivery of the machinery the defendant signed the purchase-money notes, without objection as to delay in delivery, and that he afterwards paid one of the notes. He testified as follows: "They shipped the planer and matcher approximately 90 days after they promised them, and did not ship the double end trimmer with it. The contract I had was to double end trim the lumber before it was dressed. Well, I didn't have the saws to do this, and I had to hold on approximately six weeks, my recollection is, before the saw came to test it out. The clause in the contract was 30 days, and you see I went by the board on that, the 30-day clause, and I didn't test it out; I was waiting for the saw, and as soon as I began to run it the defect began to show up. The first defect I discovered was when I went to change the knives, it was galded in the set screws that hold the knife in the cylinder head. By 'galded' I mean it was stuck there; you couldn't move it, couldn't get it out, couldn't loosen it. This head revolving 4,000 revolutions a minute, it is necessary to have it correct, to hold these knives in there. And there were some set-screws that we couldn't move to get the knife out. There were six knives in the head, and when I went to

move the set-screws they were stuck. The knives had to be taken out to sharpen them, to keep them sharp, so they would dress your lumber smooth. That was a mechanical defect through mere carelessness in the factory in not doing it properly. Either the set-screw was too large or the hole was not shaped out for the size, and it jammed in there and knitted the metal together, and you couldn't get it out. As to being able to discover that defect in the 30 days from the time the machine arrived, I didn't operate the machine for 30 days, didn't start it off. The machine waited for the other equipment. After I began to operate I discovered that,—I think, the next day. We ran some lumber through it, and when the knives got dull and I wanted to change them, that was when I discovered the set-screws. . .. I ran the machine some, but very little. . . There were a number of other defects; it would take me some time to go over them. That planer has what you call a top and bottom head and two side heads. In dressing timber and lumber, you dress four sides at one operation. The machine, if it did operate at all, would in fact plane two sides and two edges. 'Matching' is a term we use in the shop. We dress two sides and match two edges, and dress it off and make it absolutely square, so when the timber is used · in a building it will match up and be square, finished. 'Matching' means finished as well as dressed. All four sides would be dressed by the planer in one operation. This machine was not intended or designed to plane two sides by one operation and then two more sides by another operation. If you are going to buy a planer for two sides, you would buy what they call a two-head plane. This is a four-head machine; dresses all four sides at one operation; it has two heads, and two on the side.

"The capacity of the machine that was sent did not conform to the size in the contract here. The size I have got there will dress 14 inches wide and six inches thick. The reason it won't dress 8 inches thick is because it has got 6-inch heads on it. It lacks two inches of reaching to the top of an · 8-inch timber. The head or cylinder is the part that the knives are fastened to, that revolves as the timber passes, and they cut the timber as it passes by. The side heads are six inches high. It lacks two inches of reaching to the top of an 8-inch timber. You can not get 15 inches through it unless you fix the machine different. Along the side of the

machine is a guide to guide the timber straight through, so as to make it true, and to get 15 inches you have to throw it off the body, that is out from the roll. There is a feed-roll that feeds the timber through; and when you make that adjustment it wouldn't be practical to operate the machine in that condition. To line it up like the machine should run, it is impossible to get over 14 inches in width. I don't recall any other defect in the machine right now but the top cylinder—the size of it, it won't take the size the contract calls for; I couldn't use it. . .

"I received this machine in good faith, thinking that I had what I had bought, having no idea there were any defects in it of faulty workmanship. I didn't go and inspect it; I started it up and began to run it, and these defects would develop, and as I would change the machine and change from one size to another, and change the knives and replace them,—in other words, the defects developed as we worked with the machine from time to time. . . The machine was a different size, and besides being smaller than what I bought, it was defective in a number of ways. . . The machine was bought in one contract, to be shipped in one car, and they shipped it in piecemeal, the planer and matcher and then the saw, and the pulley came along later. As to the necessity of that pulley, it was one of the pulleys, the feed pulleys for operating the machine. . . I did not particularly object to it being a different machine, or where it came from, but, what got me in Dutch, they didn't ship me anything. I have never raised any particular objection to the trimmer, except that they didn't ship it; that is, they didn't ship it when they said they would ship it. They shipped both finally. . . If I bought new chip-heads and knives and the set-screws were not galded, that would overcome my objection to the galded set-screw. . . When that planer and matcher came, there were pulleys on it, but not complete; there were quite a number of pulleys on it, but there was one feed pulley they didn't send, and that record there will show when they shipped it and why they left it off. When the machine came, there were pulleys, but it was not in such condition that I could have tested it out the day it came if I had set it up, not according to the contract and according to the agreement I had with Mr. Stewart. I could not have tested that machine the morning it came, if I had installed it, for you know a machine of that size weighs about four-

teen or fifteen thousand pounds, and I could not have built a foundation to install it and got the blow-pipe system up. I could not have made a test without this particular pulley. I might have tested it and inspected it all over if I had had any idea that it was not what I bought, but the machine, from general appearances, looked to me like what the contract called for. I didn't know it was wrong. I didn't tear it up. When I received the planer and matcher on May 15, 1923, the first thing I did was to put it on the foundation, and the next was the blow-pipe to put in the fan. As I say, I thought, from the general appearances, that I had received what I had bought. The double-end trimmer had not come. The contract I had, and the lumber I had on the yard, called for a double-end trimmer. My contract called for a double-end trim, and I couldn't ship out that order, because I had no way to get it off and hence I couldn't test the machine, couldn't run it. By testing it, I mean operating it as I wanted to operate it. . . I could have tested it without a trimmer at all, I could have fitted it up and monkeyed with it, but that is not good business for a fellow to ship you a machine and then you commence fooling with it.

"I bought the machine to do certain work which I had a contract for, and I didn't operate that machine, never ran it, never put the belt on; didn't test it until the other machine came, and tested it on the actual work I was going to do. . . There were two pulleys came with the planer and matcher on May 15, 1923. There was no reason why that planer and matcher should not have been tested as soon as they were installed, except that the reason I didn't test it was it would have cost me money to run an experiment. I did have the money to spend on experimenting on a machine that I had bought to be what the contract called for; that is the reason. . . When I refer to experimenting on the machine, I mean testing it. Experimenting or testing it to see if it was what it should have been. Within 30 days after I received the planer and matcher I could have tested it, except for the fact that I didn't want to spend the money, didn't want to rig up and run some tests there; in other words, in my business I contract to dress certain sizes and quantities of lumber, and to run an experiment would have cost quite a lot of money for labor and lumber. When you go to experimenting with different sizes of lumber, you

have got no sale for it, nobody wants those different sizes; so what I did was to wait until I got started and start on my contract. This pulley that I refer to came along about July 1, was one of the feed pulleys. . . I did not write for a set-screw. I reported the set-screws galded, and they wrote me they would send a tap and some set-screws to replace the ones that were bad. I received the tap, but I never did receive the set-screws; they never showed up, though I waited some time for them; they never came."

*Walter S. Dillon,* for Meredith.

*J. Cassidy Grimes, Bryan & Middlebrooks,* contra.